[Crim. No. 3239. In Bank.—May 14, 1929.]

In the Matter of the Application of H. T. BATTELLE for Writ of Habeas Corpus.

230

Pillsbury, Madison & Sutro and Devlin & Devlin & Diepenbrock for Petitioner.

U. S. Webb, Attorney-General, and Charles A. Wetmore, Deputy Attorney-General, for Respondent.

RICHARDS, J.—The petitioner herein applies for release upon a writ of *habeas corpus*. His application is accompanied with those of eight other applicants who have separately presented petitions, similar in the main, for release from their alleged illegal detention, as a result of certain proceedings affecting all of said applicants and which are sought in each case to be reviewed. On January 17, 1929, the state senate, the California legislature being then in session, adopted a resolution providing for the appointment by the president of the senate of five members thereof for certain purposes and with certain powers hereinafter to be set forth. The resolution itself was preceded by certain recitals which, briefly summarized, provided that, whereas the state of California and

its political subdivisions have under way certain public improvements in the way of the construction of highways, bridges, dams and other structures, certain of which are specifically set forth and which will require the expenditure of large sums of public money; that in the modern construction of such structures cement is one of the elements most used and most largely entering into the cost of such construction; that the experience of many years has shown that free competitive bidding is the best means of obtaining the materials for both public and private structures at the lowest cost, and that accordingly the laws of California provide that all supplies for public improvements shall be purchased upon competitive bids and from the lowest bidder; and that in order that this policy may be carried into effect, it is necessary that monopolies, trusts and conspiracies in restraint of trade affecting the prices of commodities, if any such exist, should be regulated and suppressed, to the end that the people may have the benefit of lower prices of material by free competitive bidding; ''and whereas, there is a reputed cement trust in this state, composed of manufacturers and dealers in cement forming a combination to control and maintain high and uniform prices, by stifling free competition, thereby increasing the costs of all improvements in which cement is used, which is evidenced by reports from the State Purchasing Department, showing bids of all manufacturers bidding to be the same, thereby depriving the department of the benefit of advantageous prices through free competition, and the same conditions are reported in municipal purchases and by private contractors, now, therefore, be it resolved by the senate of the state of California, that a special committee of five members of the senate be appointed by the president of the senate to ascertain the fact whether or not an illegal combination or conspiracy exists among the manufacturers and dealers in cement, to control the market price of cement in the state of California by limiting production, suppressing free competition or other means, and upon the conclusion of such investigation to report to the senate the results thereof, together with such recommendations as the committee shall deem proper.'' The resolution then proceeded to define the authority and powers of the committee thus to be appointed: ''That said committee be and it is hereby authorized and empowered to do any and all things

necessary to make a full and complete investigation of the matters and subjects hereinbefore enumerated, or recited, and to that end to employ all necessary clerical, expert and legal assistants, and said committee is hereby authorized and empowered to summon witnesses, require the production of persons, books, accounts, agreements, minutes of meetings, documents, records and papers of every kind, to issue subpoenas and to take all necessary means to compel the attendance of witnesses and to procure testimony; and the members of said committee are, and each of them is, hereby authorized to administer oaths; and all the provisions of article VIII of chapter 2, title I, part III of the Political Code of this state, relative to the attendance and examination of witnesses before the legislature and committees thereof, shall apply to the committee appointed under this resolution." The sergeant-at-arms of the senate was made the executive officer of the committee, with power to serve any and all subpoenas and orders that may be issued by said committee. The resolution finally provided: "that said committee be given leave to sit during the sessions of the senate and during the recess, at such place or places as the committee may determine; that it report as speedily as possible, the results of its investigation to the senate, with such recommendations as it may deem proper, relative to abuses or wilful violation of the anti-trust law (Cartwright Act), and the particulars, if any, wherein said law should be strengthened and made more effective to prevent illegal combinations or conspiracies in restraint of trade."

Pursuant to the foregoing resolution the president of the senate appointed the following five members thereof to constitute and function as such committee, viz.: Senators H. C. Jones, J. M. Inman, J. I. Wagy, F. S. Boggs and Henry E. Carter. The committee presently organized by the selection of Senator H. C. Jones as the chairman thereof and the appointment of the necessary clerks, reporters and other assistants. Later during the sessions of the committee Senator Jones became ill and unable to be present, and Senator Inman was thereupon somewhat informally selected to act as vice-chairman of the committee. The sessions of the committee opened in San Francisco on January 24, 1929, whereupon it was made to appear that a communication had been sent by the chairman to a large number of companies

or corporations manufacturing or dealing in cement, notifying them of the dates upon which the hearings of the committee would be held in San Francisco and also in Los Angeles, to the end that they might be present or represented by their officials or other representatives. There were a few appearances from among the number thus notified on the first day set for these hearings and others appeared later, until by their officials or counsel practically all of those who had been sent the foregoing notice had appeared. The committee opened its hearings on the day appointed therefor in San Francisco by receiving certain testimony and tabulations from members of the state purchasing department, showing that during the years 1926 to 1928 bids had been asked by the state through said department for supplying cement upon some eighteen construction projects throughout the state of California; that as to these projects for public construction which had their situs in northern or central California the bidders were cement producers or dealers having their plants or offices in northern or central California, and as to these the testimony and tabulations of the state purchasing agencies showed that the bids of these were practically identical upon each and all of these projects. As to the projects which had their location in southern California the bidders were in the main southern producers or dealers in cement and as to these it appeared that with certain minor exceptions a similar identity in the figures of the several bids was in each instance shown. It was further made to appear that the bids for cement to be furnished the state harbor commission of San Francisco made by these northern bidders were identical throughout. As to bids furnished upon state projects undertaken during the year 1926 a like identity in the figures of the several bidders was disclosed. Certain testimony with reference to the construction work of the East Bay Municipal Utility District was to the same general effect in so far as it disclosed similar identities in the bids offered upon the building projects of that organization. In the course of the foregoing branch of the committee's investigation it was made to appear that upon several occasions wherein identical bids were offered all of these bids were rejected for no other apparent reason than that their identical figures aroused among those calling for bids the suspicion of a concert among the bidders. In one instance an interesting

and possibly suggestive variation occurred. That was in the case of the calling for bids in May, 1924, for the construction of the Exchequer dam on the Merced River not far from the city of Merced by the Merced Irrigation District, the amount of cement required being estimated at 350,000 barrels. Bids were tendered by five central California cement companies, which upon being opened were found to be identical in the amount bid, which was $3.69 per barrel. These bids were rejected and a new advertisement for bids for cement was ordered and had on behalf of the district. When this second set of bids was opened the same practical identity from the same set of bidders appeared. These bids were also ordered rejected and another advertisement was ordered and had. When this third set of bids was opened there was a marked variance in the amounts of the several bids, the bid of the Pacific Portland Cement Company being $3.32 per barrel of cement, which was five cents lower per barrel than that of the Henry Cowell Lime & Cement Company, its nearest competitor. The Pacific Portland Cement Company was awarded the contract for the full amount of cement then required. Mr. Robert B. Henderson, president of the Pacific Portland Cement Company, and who had responded to the request of the committee, and was present without further subpoena, was next called upon to testify, and without being then sworn was questioned at considerable length and gave his answers freely and without objection to a wide range of inquiry into matters affecting the production and marketing of cement more especially by his own organization. He was then asked certain particular questions hereinafter to be identified and each of which, upon the advice of his counsel, he declined to answer. He was also requested by the committee to produce before it certain of the books, records, reports and files of the corporation of which he was president for its inspection, or, in lieu of such production, to permit the inspection and examination of these by the expert auditors and accountants appointed to assist the committee in its said investigation. With each of these requests Mr. Henderson, upon the advice of counsel, refused to comply. He was then excused and was not recalled or subjected to further inquiry or subpoena; but at a later stage of the investigation H. T. Battelle, the petitioner herein and the secretary of the Pacific Portland Cement Company, was

required to attend as a witness, under a subpoena and *subpoena duces tecum* and, being sworn, was asked by the committee through its acting chairman practically the same questions which had formerly been asked of Mr. Henderson, and which, upon the advice of counsel, he also declined to answer; and there was also demanded of him under said *subpoena duces tecum* the production or permission to inspect and examine the same books, documents and papers which Mr. Henderson had refused to produce or give access to, and he also upon the advice of counsel repeated such refusal. During the course of the investigation and the sittings of the committee held in San Francisco, Los Angeles and Sacramento various other persons, including those representatives of the several cement companies who have also contemporaneously filed their applications for writs of *habeas corpus*, appeared before it and submitted themselves and the organizations which certain of them in varying capacities represented to the questionings of the chairman and members generally of the committee, and in the main responded cheerfully and willingly to inquiries extending over a wide range of inquest into the practical activities of the cement industry, and only declined to answer questions and furnish information or means of information concerning the same matters to which, in the main, the questions asked and the information sought by *subpoena duces tecum* had relation. Whether the questions asked and answered by these various persons other than the petitioner herein had or have a material bearing upon the right of this petitioner to stand upon his refusal to answer the inquiries or furnish the information or the means for obtaining it required by the committee will be hereinafter considered. The investigation having thus far proceeded, the committee, on March 8, 1929, made and presented to the state senate, then in session, the following report:

"Senate Chamber, Sacramento, California, March 8, 1929.

"Mr. President: We, the undersigned, your committee to whom was referred the investigation of a reputed illegal combination or conspiracy among manufacturers and dealers in cement in the state of California for the control of the market price of cement and the suppression of free competition, with full power to act in the premises and to issue subpoenas and bring witnesses before it and examine them

as to the facts or the purported facts as to such reputed combination or conspiracy, and to compel the production for examination by your committee of all necessary books, papers, documents, records and information, all as more fully and particularly set forth and provided in that certain resolution adopted by the senate on the seventeenth day of January, 1929, under and pursuant to which resolution we were appointed a committee, hereby report to your honorable body, the senate of the state of California:

"That we, your committee, undertook to make said investigation and held meetings in San Francisco on January 24 and 25, 1929; in Los Angeles on February 4, 5 and 6, 1929, and in Sacramento on February 25 and 26 and March 5 and 7, 1929, for the purpose of examining witnesses, and examining books, papers, documents, records, and information; that in the case of each witness and prior to his attendance we caused a *subpoena duces tecum* to be duly and regularly issued and served and the same was duly and regularly issued and served upon him requiring his presence to testify and requiring him to bring with him certain books, papers, documents, records and information in his possession or under his control, designated and described in the subpoena, and that the following named persons were present and appeared before your committee, viz.:

"Robert B. Henderson, W. H. George, George R. Gay, E. E. Duque, John Treanor, C. C. Merrill, C. A. Low, Arthur B. Shelby and A. Emery Wishon; that said witnesses hereinabove named were examined individually, and required to give certain testimony and to produce certain documents, records, and information for examination by your committee;

"That said witnesses and each thereof contumaciously refused and declined to answer questions material to the issues and refused to produce material and proper books, papers, documents, records and information required of them and in their possession or under their control, all as more particularly appears from the transcript of testimony given and proceedings had upon said investigation, which said transcript, consisting of five volumes, is filed herewith and by this reference as fully and completely made a part hereof as if fully set forth herein at length.

"Wherefore, we, your said committee, hereby render and file this report of said refusal of said witnesses so to testify or to produce said books, papers, documents, records and information, for such action as may be deemed necessary by the senate.

"Respectfully submitted,

"J. M. INMAN,

"J. I. WAGY,

"F. S. BOGGS,

"HENRY E. CARTER,

"Committee."

Accompanying the report of the committee and expressly made a part thereof there was filed and presented to the senate a voluminous transcript of the testimony taken and proceedings had before the committee during its said several sessions, and also the originals of the subpoenas and *subpoenas duces tecum* issued and served under the direction of the committee. Thereafter and on March 14, 1929, the senate in regular session adopted the following resolution:

"Whereas, this honorable Senate has undertaken to investigate as to the existence or nonexistence of a reputed illegal combination or conspiracy among manufacturers and dealers in cement in the state of California, for the control of the market price of cement and the suppression of free competition; and

"Whereas, on January 18, 1929, the president of this honorable Senate, pursuant to the resolution of said senate, adopted on January 17, 1929, appointed Senators Boggs, Carter, Inman, Herbert C. Jones and Wagy as a committee to investigate as to the existence or nonexistence of such reputed illegal combination or conspiracy, with full power to issue subpoenas and bring witnesses before it and examine them as to the facts or the purported facts as to such reputed combination or conspiracy, and to compel the production for examination by said committee of all necessary books, papers, documents and records material thereto; and

"Whereas, said committee so appointed by this senate undertook to discharge its said duty of investigation as to the existence or nonexistence of such reputed illegal combination or conspiracy; and

"Whereas, *subpoenas duces tecum* were duly and regularly issued and duly and regularly served upon Robert B. Henderson, W. H. George, George R. Gay, E. E. Duque, John Treanor, C. C. Merrill, C. A. Low, Arthur B. Shelby, H. T. Battelle and A. Emery Wishon, requiring each of the said persons to appear before said committee to testify, and requiring each of them to bring with him certain books, papers, documents and records, such being in his possession or under his control, and designated and described in the subpoena; and

"Whereas, in pursuance of said subpoenas duly and regularly issued and served, said persons appeared before said committee of investigation of this senate, and refused and declined to answer certain questions material to the issues and refused to produce proper books, papers, documents and records required of them, such being in their possession or under their control and material to said issues, all as more particularly appears from the report of said committee presented to and filed with this senate, on March 8, 1929, and from the supplemental report of said committee presented to and filed with this senate on March 11, 1929, said questions being also set forth in the 'Excerpts from the transcript of testimony' submitted to the senate, March 8, 1929, to which reference is hereby made; and

"Whereas, the truth as to the existence or nonexistence of such reputed illegal combination or conspiracy is supposed to rest and be within the knowledge of these said witnesses, or in the proper books, papers, documents and records required of them, such being in their possession, or under their control; and

"Whereas, the said committee has reported to this senate the contumacious refusal of said witnesses to answer questions material to the issues propounded to them by said committee and to produce proper books, papers, documents and records material to said issues, for such action as may be deemed necessary by the senate, now, therefore, be it

"Resolved, That the said Robert B. Henderson, W. H. George, George R. Gay, E. E. Duque, John Treanor, C. C. Merrill, C. A. Low, Arthur B. Shelby, H. T. Battelle and A. Emery Wishon be and they are hereby declared to be guilty of contempt of this senate; and be it further

"Resolved, That the said Robert B. Henderson, W. H. George, George R. Gay, E. E. Duque, John Treanor, C. C. Merrill, C. A. Low, Arthur B. Shelby, H. T. Battelle and A. Emery Wishon be taken into custody by the Sergeant-at-Arms of the Senate and that they be committed to the county jail in the county of Sacramento, State of California, until they shall have purged themselves of this contempt by answering the questions which were propounded to them by said committee and by producing the proper books, papers, documents and records material to said issues required of them; that a copy of this resolution, duly attested by the Secretary of State, be the authority of the Sergeant-at-Arms of the Senate, and the Sheriff of the county of Sacramento."

Under the directions of the foregoing resolution the sergeant-at-arms of the senate placed the petitioner herein under arrest and was detaining him thereunder and by authority thereof when the writ sought by the petitioner herein was issued. Subsequent to said arrest and detention and the issuance of said writ the following stipulation was entered into between counsel for this and the other several petitioners for similar writs and the attorney-general representing the state senate, in his official capacity:

"It is understood and agreed by the parties hereto that this court [the Supreme Court] in the consideration and determination of this matter, may assume it to be a fact that prior to the passage of the resolution by the Senate reciting that the petitioner was in contempt of the Senate, petitioner appeared before the bar of the Senate and was there given opportunity to purge himself of the alleged contempt by answering the questions and producing the books, papers, documents and information which had been previously refused by him, and not otherwise; and that he did not do so upon advice of counsel, for each and every reason assigned in the petition herein."

The sergeant-at-arms of the senate made in due course his return to said writ, which merely set forth that he was holding the petitioner under and by virtue of a warrant of arrest issued pursuant to the foregoing resolution of the state senate, and which resolution was made a part of his said return. A traverse to said return was filed, which presented no issue of fact, but the same questions of law as were urged in his said petition. The matter came before

this court for hearing upon the record as thus made up, and, after argument and the filing of elaborate briefs, has been submitted for decision.

The basic contention which the petitioner herein urges against the validity, from their very inception, of the proceedings out of which his alleged unlawful detention has arisen is that neither the state legislature nor either branch of it had power to adopt the resolution which the state senate did adopt, calling into being a committee composed of certain of its membership for the purpose of conducting the proceedings provided for in the body of said resolution. This contention is predicated upon the following provision of the state constitution:

"The powers of the government of the state of California shall be divided into three separate departments—the legislative, executive and judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except as in this Constitution expressly directed or permitted." (Const., art. III, sec. 1.)

It is argued by the petitioner that the only exceptions which are embodied in said constitution to the complete and exclusive segregation of these separate departments of the state government specified in the foregoing provision thereof are those which permit each house (1) to adjudge the qualification and election of the members thereof (sec. 7, art. IV), (2) to expel a member (sec. 9, art. IV), and (3) to sit as a court of impeachment (secs. 17, 18, art. IV), and that outside of these express exceptions the legislature may not go in the attempted exercise of any judicial or *quasi*-judicial function. We are of the opinion, however, that this contention, if adopted by us in the full measure of its strictitude, would draw the line too narrowly about the powers of the legislature in respect to its prime and exclusive function, viz.: that of legislation. ▮▮ The power and duty reposed in the legislature and in each and every member of both houses thereof is obviously that of enacting, and hence, necessarily, of preparing and proceeding to enact wise and well-formed and needful laws. An essential prerequisite to the proper exercise of these powers and duties on the part of each member of the law-making body during the comparatively brief and hurried period of its biennial sessions is the pos-

session of a degree of general intelligence; this of course. But in regard to the many and, to be particular, the most important matters which in this age of new ventures and of large concerns occur and recur as the most insistent subjects of legislation, this is not enough; and hence, in many instances, in order to the preparation of wise and timely laws the necessity of investigation of some sort must exist as an indispensable incident and auxiliary to the proper exercise of legislative power. This has been recognized from the earliest times in the history of American legislation, both federal and state, and from even earlier epochs in the development of British jurisprudence. (See notes to *Marshall* v. *Gordon*, 243 U. S. 521 [Ann. Cas. 1918B, 371, L. R. A. 1917F, 279, 61 L. Ed. 881, 37 Sup. Ct. Rep. 448]; *Burnham* v. *Morrissey*, 14 Gray (Mass.), 226 [74 Am. Dec. 676]; *Wilckens* v. *Willet*, 4 Abb. Dec. (N. Y.) 596; *Anderson* v. *Dunn*, 6 Wheat. (U. S.) 204 [5 L. Ed. 242, see, also, Rose's U. S. Notes]; *Federal Trade Com.* v. *American Tobacco Co.*, 264 U. S. 298 [32 A. L. R. 786, 68 L. Ed. 696, 44 Sup. Ct. Rep. 336]; *Harriman* v. *Interstate Commerce Com.*, 211 U. S. 407 [53 L. Ed. 253, 29 Sup. Ct. Rep. 115]; *In re Chapman*, 166 U. S. 661 [41 L. Ed. 1154, 17 Sup. Ct. Rep. 677]; *Kilbourn* v. *Thompson*, 103 U. S. 168 [26 L. Ed. 377].)

We do not deem it necessary to deal in detail with the foregoing line of authorities, for the reason that this has been sufficiently done in certain later decisions to which we shall presently refer. ■ Before doing so, however, we deem it proper to state that, under the foregoing authorities, the inherent and auxiliary power reposed in legislative bodies to conduct investigations in aid of prospective legislation has already been held to carry with it the power in proper cases to require and compel the attendance of witnesses and the production of books and papers by means of legal process and to institute and carry to the extent of punishment contempt proceedings in order to compel the attendance of such witnesses and the production of such documentary evidence as may be legally called for in the course of such proceedings, whether conducted by the legislative body or a branch of it, directly or through properly constituted committees thereof. ■ We deem it timely, also, to state at this point in our inquiry that, by uniform

custom, more or less rigidly adhered to, every official in-
quisition has from the earliest times made use of procedural
methods which resemble those obtaining in judicial tribunals.
This is because, in the nature of things, as exemplified by
human experience, such methods have been found to fur-
nish the surest means of arriving at the truth of the par-
ticular matter involved in the inquiry. It does not follow,
however, that legislative bodies or administrative agencies
or municipal organizations or executive officials by the mere
employment of methods of procedure which resemble those
employed or required in judicial tribunals must be held to
be engaged in the exercise of a judicial function and to be
thereby trenching upon the area exclusively assigned to
the judicial department of the state government. There
has been some confusion in judicial decisions touching this
subject which it is beyond the scope of our present inquiry
to clear away, but it may not be inapt at this point to
refer to the comment of Cooley in his great classic on Con-
stitutional Limitations, wherein, after reviewing many au-
thorities, he draws the conclusion, "That that which dis-
tinguishes a judicial from a legislative act is that the one
is a determination of what the existing law is in relation to
some existing thing already done or happened, while the
other is a predetermination of what the law shall be for the
regulation of all future cases falling under its provisions."
In the opinion of Mr. Justice Holmes in the comparatively
recent case of *Prentis* v. *Atlantic Coast Line Co.,* 211 U. S.
210 [53 L. Ed. 150, 29 Sup. Ct. Rep. 67], it is thus stated:
"A judicial inquiry investigates, declares and enforces lia-
bilities as they stand on present or past facts and under
laws supposed already to exist. That is its purpose and
end. Legislation, on the other hand, looks to the future and
changes existing conditions by making a new rule to be
applied thereafter to all or some part of those subject to
its power." That the method of each may resemble that of
the other in the course of their respective inquests having
these two different ends in view is not the important or
determining factor, since the same underlying considera-
tion operates to guide the procedural steps of both.
Legislatures in enacting laws, like courts in interpreting
such laws when enacted, must have in regard the former law,
if any, the wrong or defect requiring remedial action, and

the nature and extent of the needed and appropriate remedy. In the application of this principle it follows necessarily that the power of these co-ordinate branches of government, in conducting whatever inquisitions the proper exercise of their respective functions require, must be as broad as the subject to which the inquiry properly entered upon by either has relation. Such we understand to be the rule enunciated by the later authorities, to which we shall now refer. In the case of *McGrain* v. *Daugherty*, 273 U. S. 135 [50 A. L. R. 1, 71 L. Ed. 580, 47 Sup. Ct. Rep. 319], the Supreme Court of the United States was called upon to decide two main questions, each germane to the inquiry here under review. The first of these related to the broad powers of the Congress of the United States, or of either branch thereof, to institute and conduct investigations when it reasonably appeared that the purpose thereof was an essential and appropriate auxiliary to the legislative function. In deciding this primary question the court, Mr. Justice Van Devanter writing the opinion, entered upon a most careful and exhaustive review and restatement of the leading cases in both state and federal jurisdictions touching the subject, including those above cited, and many others, and in which cases the right to the exercise of these powers by legislative bodies of both jurisdictions was granted or denied, depending upon the facts of the individual case, but in which the principle was quite uniformly asserted as to the existence of such powers in all proper cases as essential, incidental and auxiliary to the exercise of the legislative function. In the course of this review of cases the learned justice gave due consideration to the case of *Kilbourn* v. *Thompson*, which both counsel in the instant inquiry have relied upon as upholding their opposing contention, and showed that, while it contained some language of doubtful import, and while it denied to a congressional committee the asserted right in the individual case, it did so upon the express ground that the particular inquiry and the resolution of the house of representatives which authorized it embraced no suggestion of contemplated legislation, and that the matter sought to be elicited was one in respect to which no valid legislation could be had. Otherwise the case of *Kilbourn* v. *Thompson, supra,* is not at variance with the general line of decision upon the possession of the foregoing authority

244

as being auxiliary to the legislative grant of power. ■
It will be seen from the authorities cited in the McGrain
decision that it is quite immaterial whether the power of
inquiry is to be exercised by a state or a federal legislative
body, and that it is equally immaterial in the exercise of
that power whether the legislative arm of the government
is acting under or by virtue of granted or reserved authority; and that it is also quite immaterial what the particular
constitutional limitations may be which separate legislative
from judicial functions of government and which forbid the
trespass of the one upon the domain of the other; since, if it
is to be conceded that the possession and exercise of the
power of preliminary inquiry is an essential incident and
auxiliary to the legislative function, it follows irresistibly that
the legislative arm of government is not to be restricted in
the exercise of this power under limitations hereinafter to
be defined by the fact that methods and processes, judicial
or *quasi* judicial in character, are employed in the course
of the inquiry. In the McGrain case the learned justice
closes this branch of the decision with the following significant statement:

"A legislative body cannot legislate wisely or effectively
in the absence of information respecting the conditions which
the legislation is intended to affect or change; and where
the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must
be had to others who do possess it. Experience has taught
that mere requests for such information often are unavailing,
and also that information which is volunteered is not always
accurate or complete; so some means of compulsion are
essential to obtain what is needed. All this was true before
and when the constitution was framed and adopted. In
that period the power of inquiry—with enforcing process—
was regarded and employed as a necessary and appropriate
attribute of the power to legislate—indeed, was treated as
inherent in it. Thus there is ample warrant for thinking,
as we do, that the constitutional provisions which commit
the legislative function to the two houses are intended to
include this attribute to the end that the function may be
effectively exercised."

■ The second subject of consideration in the McGrain
case which is germane to the instant proceeding was the

question erroneously decided by the inferior federal tribunal and transferred to the court of last resort for review. That was the question as to whether the purpose of the investigation was to determine the guilt of the attorney-general of the United States of the shortcomings and wrongdoings set forth in the resolution authorizing the inquiry, and which might submit him to prosecution, or was the purpose also foreshadowed in the resolution of "obtaining information necessary as a basis for such legislation or other action as the senate may decree necessary and proper." In discussing this phrasing of the resolution directly under criticism the court says: "This avowal of contemplated legislation is in accord with what we think is the right interpretation of the earlier resolution directing the investigation. The suggested possibility of 'other action' if deemed 'necessary or proper' is, of course, open to criticism in that there is no other action in the matter which would be within the power of the senate. But we do not assent to the view that this indefinite and untenable suggestion invalidates the entire proceeding. The right view in our opinion is that it takes nothing from the lawful object avowed in the same resolution and rightly inferable from the earlier one. It is not as if an inadmissible or unlawful object were affirmatively and definitely avowed." The applicability of the foregoing language to the instant matter will be seen when the precise terms and proper interpretation of the resolution of the state senate which is assailed in the present proceeding comes under review. In the above case, also, certain limitations attending the exercise of the foregoing powers by legislative bodies or their committees were set forth with sustaining authorities. It is, however, in the more recent case of *Sinclair* v. *United States, etc.,* just decided by the Supreme Court of the United States (279 U. S. 263 [73 L. Ed. 691, 49 Sup. Ct. Rep. 268]), that both the foregoing powers and the definite limitations attending their exercise are most clearly and conclusively stated. This case in its main aspects has a most important bearing upon the matter before us by virtue both of its similarities and of its points of divergence. It arose out of the same series of situations which gave rise to the case of *McGrain* v. *Daugherty, supra,* but it presents as to its facts a case having certain significant resemblances to the instant proceeding. In the case just

cited Sinclair had been summoned as a witness to give testimony respecting certain leases of oil and gas bearing lands which had been entered into between the secretaries of the navy and of the interior departments of the federal government and certain corporations of which, at the time thereof, Sinclair was in control, and which said leases were being assailed in both judicial and legislative proceedings as surcharged with fraud in their procurement. The immediate investigation in which he was being required to give testimony was being conducted by the committee of public lands and surveys of the United States senate, acting under the authority of certain resolutions adopted by that branch of Congress of the United States, directing it "to investigate this entire subject of leases upon naval oil reserves, with particular reference to the protection of the rights and equities of the government of the United States and the preservation of its natural resources, and to report its findings and recommendations to the senate." There were several such resolutions adopted by the senate before the committee got finally into action, and in one of the latter of these, designated as Senate Resolution 147, the committee was given the further direction to "ascertain what, if any, other or additional legislation may be advisable, and to report its findings and recommendations to the senate." Upon being summoned before the committee and asked certain questions, which the court finally decided were pertinent to the matter under inquiry, Sinclair declined to give his testimony in response to such questions and submitted a statement in justification of his refusal to testify, wherein he asserted "that the committee could not thus investigate the matters covered by the authorization because the senate by the adoption of the joint resolution had exhausted its power and congress and the president had made the whole matter a judicial question which was determinable only by the courts." The "joint resolution" to which Sinclair referred was "Joint Resolution 54," wherein the Congress had theretofore directed certain legal proceedings to be instituted and which were then pending to set aside the leases in question. The senate committee persisted in its inquiry, with the result that Sinclair, upon his persistent refusal to testify, was indicted under the federal procedure (R. S., sec. 102, U. S. C., tit. 2, sec. 192 [2 U. S. C. A., sec. 192]), and

his case came finally before the United States Supreme Court for a review in this recent case. The court first gave its consideration to the case of *McGrain* v. *Daugherty, supra,* fully affirming the possession by the Congress and each of the houses thereof of "not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers as are necessary and appropriate to make the express powers effective." The court next proceeded to define the limitations upon the exercise of these auxiliary powers as outlined in the McGrain decision, stating that "that case shows that, while the power of inquiry is an essential and appropriate auxiliary to the legislative function, it must be exercised with due regard for the rights of witnesses, and that a witness rightfully may refuse to answer where the bounds of the power are exceeded, or where the questions asked are not pertinent to the matter under inquiry." The court proceeded to a review of certain cases wherein the last-named doctrine was elucidated and enforced and to some of which we shall later refer. In the course of its discussion the court proceeded to dispose of the contention that the committee had been bereft of power to conduct the immediate inquiry by the fact that judicial proceedings had been instituted and were then pending for the avoidance of the leases in question, the court holding that, notwithstanding the pendency of such litigation and the possible aid which might be afforded thereto by the prosecution of the senatorial inquiry, these facts would not suffice to show "that the committee intended to depart from the purpose to ascertain whether additional legislation might be advisable." The court further stated that "The validity of the lease and the means by which it had been obtained under existing law were subjects which might properly be investigated in order to determine what, if any, legislation was necessary or desirable in order to recover the leased lands or to safeguard other parts of the public domain." Having thus disposed of the foregoing consideration having a direct bearing upon the first branch of the cause now before us, to wit, the validity of the senate resolution authorizing the committee to institute the investigation out of which the pending application for a writ of *habeas corpus* arose, the court in the Sinclair case proceeded to pass upon the vital question of the pertinency of the question which the witness

refused to answer to the matter under inquiry before the committee. In deciding this question the court in that case made certain observations to which we shall later refer.

We are thus brought to a consideration of the precise scope of the senate resolution as evinced by its terms under the authority of which its committee undertook to conduct the investigation out of which the instant proceeding arose. The resolution, in the several recitals which precede it, refers to the conceded fact that the state of California directly, and also through its several subordinate subdivisions and agencies, is engaged in the making of certain extensive public improvements in the way of street and highway construction, the building of dams and reservoirs for water conservation and flood control, and of bridges and other structures, into all of which the increasing use of cement enters as one of the main elements of cost. The resolution proceeds to further recite that experience has shown that free competitive bidding upon both public and private work is the best means of obtaining the lowest cost of construction, and hence that the laws have provided for competitive bidding upon all public work, and that in order that such laws may be effective it is necessary that monopolies, trusts and conspiracies in restraint of trade, and affecting the prices of commodities, should be regulated and dissolved through actions to be instituted by the attorney-general; and whereas there is a *reputed* cement trust in this state, composed of manufacturers and dealers in cement, forming a combination to control and maintain high and uniform prices by stifling free competition, thereby increasing the cost of all improvements in which cement is used, it is therefore resolved that a special committee of five members of the senate be appointed by the president thereof to "ascertain the fact whether or not an illegal combination or conspiracy exists among the manufacturers and dealers in cement to control the market price of cement in the state of California by limiting production, suppressing free competition, or other means, and upon the conclusion of such investigation to report to the senate the results thereof, together with such recommendations as the committee shall deem proper." The resolution proceeds to define the powers and procedure of the committee in the course of making such investigation, and in so doing expressly refers to and makes the provisions of

article VIII of chapter 2, title 1, part III of the Political Code of California, applicable to the procedure of the committee. The resolution concludes with the statement that "said committee be given leave to sit during the sessions of the senate and during the recess, at such place or places as the committee may determine; that it report as speedily as possible the results of its investigation to the senate, with such recommendations as it may deem proper, relative to abuses or wilful violation of the anti-trust law (Cartwright Act), and the particulars, if any, wherein said law should be strengthened and made more effective to prevent illegal combinations or conspiracies in restraint of trade." It is contended by the petitioner herein that the foregoing terms of this resolution render plain the intention of its framers that a purely judicial inquiry into the existence of past illegal practices on the part of manufacturers and dealers in cement was to comprise the sole and exclusive function of the committee thus to be constituted and of the investigation to be conducted under its authority and auspices. We are unable to so interpret the terms of said resolution nor to so narrow the scope and functions of the committee created to carry its purpose into effect. It is true that the scope of the investigation was, by the terms of said resolution, defined as having relation to the inquiry as to whether there was in existence within the state of California an unlawful combination of the manufacturers and dealers in cement, having for its reputed purpose the prevention of competitive bidding among its members and others upon both public and private work in which cement was largely employed, and counsel for this and the other like petitioners have strenuously insisted that this was its only purpose, and that this being so, its attempted action was a usurpation of judicial powers. The record, however, disclosed that the further purpose of the inquest was that of enabling the committee to make recommendations to the legislature respecting future legislation for the prevention of these and other restraints of trade, and that from time to time during the sessions of the committee this latter purpose was expressly referred to by one or the other of the members of the committee. ■ It is also true that by the terms of the resolution the inquiry was to be limited to the operations of a single great industry, but such was also

the situation in the case of *Sheppard* v. *Bryant,* 191 Mass. 591 [6 Ann. Cas. 802, 78 N. E. 394], wherein the Supreme Court of Massachusetts held that a legislative investigation into the retail coal business in certain sections of that commonwealth during the occurrence of the great coal strike of 1902 was of proper legislative cognizance and that answers given by a witness in the course of such investigation were privileged so as to exempt such witness from a suit for slander. Such was also the case of *Federal Trade Com.* v. *American Tobacco Co.,* 264 U. S. 298 [32 A. L. R. 786, 68 L. Ed. 696, 44 Sup. Ct. Rep. 336], wherein the operation of a single great industry or combination of allied industries was made the subject of legislative inquiry. Other instances among the many cases we have been asked to review might well be cited, but it will suffice to state that the general subject of this investigation was a matter of public concern; that is to say, it was an inquiry into a situation wherein the state and its subordinate agencies and activities, being largely engaged and interested in certain lines of public improvement to be carried on by means of money derived from numerous forms of taxation, was directly concerned in lessening, if possible, the burden of such taxation by diminishing the cost of such public work, and hence was clearly within its proper province in seeking to confine within legitimate channels the contact by means of competitive bidding through which the great and growing cement industry would come into the relation of a supplier of its product for use in the development and advancement of such public work. Every inquiry into alleged defects or evils which are supposed to owe their origin and existence to ineffectual laws must have their beginning somewhere and in some particular inquest, which is usually directed either in the courts or in the domain of legislation against some conspicuous offenders, and by means of which investigation, and the recommendations which follow it, some scheme of general legislation or law enforcement is evolved.

It may not be untimely to recall the fact that the resolution here under review directly refers to the Cartwright law, and that industrious counsel for one or other of the assailants of this resolution have cited us to the case of *Cline* v. *Frink Dairy Co.,* 274 U. S. 445 [71 L. Ed. 1146, 47 Sup. Ct. Rep. 681], wherein the Supreme Court of the

United States, in a quite recent opinion, has held the Colorado anti-trust law, which is in terms a replica of the Cartwright Act, to be unconstitutional in respect to the very matter sought to be covered by the terms of the resolution herein assailed. This fact of itself might well furnish a very excellent reason for the insertion in said resolution of the closing clauses thereof, which may not be ignored, and wherein the committee created by it is directed to report to the senate, its creator, at the conclusion of its inquest, "such recommendations as it may deem proper relative to abuses and violations of the anti-trust law (Cartwright Act) and the particulars, if any, wherein said law should be strengthened and made more effective." It is needless to pursue this subject at greater length for the purpose of reaching the conclusion that in the adoption of said resolution and in the constitution of the committee thereunder, with the powers and procedure specified therein, the senate was exercising a legitimate legislative function, and that the assault which the petitioner herein, and others having like applications, make upon it, and upon the legality of the committee constituted under and by virtue of it, are of no avail.

Having thus determined that the legislative committee was legally constituted and, being so, was entitled to hold its several sessions and to request and later require the attendance of witnesses and the production of books and documents before it, and having recited in the earlier stages of this opinion that the committee undertook to exercise these powers, and having found that in the exercise thereof the committee did cause to appear, in the capacity of a witness, the petitioner herein, and also the several other persons who have presented identical applications for the issuances of writs of *habeas corpus* herein, and that, having done so, did require of this petitioner and also of said other persons that he and they should answer certain questions concerning the cost, prices and profit of producing and disposing of cement, which several sets of questions he and they refused to answer, and having also required of this petitioner and of said other persons that he and they should produce before the committee certain books, documents and records of those certain cement corporations, of which said petitioner and such other persons were, respectively, the officials, and which he and

they each, in turn, declined to produce, and having seen that said committee thereupon made and presented to the state senate its report of the aforesaid proceedings, contained in several large volumes, embracing the reporter's transcript thereof, and that having received said report the senate proceeded to make its order and adjudication that said petitioner and said other persons were guilty of contempt, consisting in their and each of their refusal to answer those certain questions which were set forth in said report, and in further refusing to produce those certain books, records and papers, the production of which was required through the issuance of and service of *subpoena duces tecum,* as is also set forth in the terms of said report, and having therein directed that the petitioner and said other persons be arrested by the sergeant-at-arms of the senate and be confined in the custody of the sheriff of the county of Sacramento until such time as they and each of them should purge themselves of said contempt, and the petitioner and said other persons having been so arrested and immediately threatened with such confinement, and having thereupon applied for and had issued upon each of their petitions a writ of *habeas corpus,* and this court having held a hearing upon the appearance of the petitioner and return to said writ, the primary question in the orderly course of procedure upon this branch of our inquiry is that of determining whether or not the aforesaid order and adjudication of contempt is sufficient upon its face to justify the arrest and detention of this petitioner, and, incidentally, of each of the other of said petitioners; since, if this court should determine that said order and adjudication of contempt is void upon its face, it would be immaterial to this inquiry whether or not the petitioner and the other persons were legally justified in their refusal to answer the questions asked and to produce the books, records and papers in question and which constitute the gravamen of the charge that each of them was guilty of contempt.

At the outset of this inquiry it is to be noted that after the arrest of this petitioner and the others, in pursuance of said adjudication of contempt and the order for their arrest and confinement therein contained, and also for the issuance of this and of the other writs of *habeas corpus* as ordered by this court, a certain stipulation was

entered into between each of said petitioners and the attorney-general, representing the respondent, the text of which is hereinbefore stated. The purpose of this stipulation was to supply a fatal hiatus in the proceedings as thus far undertaken, and consisting in the admitted fact that none of these petitioners had, prior to the senate resolution adjudging them and each of them to be guilty of contempt, been accorded the opportunity to appear before that body and purge themselves of said contempt. We permitted that stipulation to be filed herein for that sole purpose, but we cannot give to it any broader effect, nor treat it as in any manner waiving any other defects which may inhere in these contempt proceedings in so far as the validity of the order and adjudication of contempt upon the face thereof is herein called in question. ■ It is urged by the petitioner, and even more strenuously by certain of the other petitioners for similar writs, that the power to punish for contempt is a purely judicial power, which this legislative body, under the restraints of the constitution, has no jurisdiction to employ. We think, however, that this question is covered by what has heretofore been said herein and by the authorities already referred to. We are, however, clearly of the opinion that the power of the state senate to adjudge this and the other petitioners named in its resolution to be guilty of contempt and to order his and their confinement is a power which can only be exercised in strict conformity with the rules of procedure which the laws of this state provide as a prerequisite to the validity of an adjudication of contempt. Section 1209 of the Code of Civil Procedure defines what acts or omissions are contempts of court, and this definition also applies to and defines what are contempts before any tribunal exercising the functions of a court. Section 1211 of said code divides contempts into two classes, viz.: (1) those committed in the presence of the court and which may be punished summarily and for the punishment of which a specific procedure is outlined, and (2) those not committed in the immediate view and presence of the court and for which another and different procedure is provided. The contempt in this proceeding sought to be adjudged and punished must be considered as coming within one or the other of these classes and as controlled by the foregoing provisions relative to each. ■ While it would seem to

be clear that prior to the making and presentation of the foregoing stipulation the alleged contempt in these several proceedings was what is known to the law as a constructive contempt—that is to say, a contempt not committed in the immediate view and presence of the court, and hence to be such a contempt as would come within the second clause of section 1211 of said code—it appears to us to be equally clear that in view of the presence and terms of said stipulation the contempt or several contempts with respect to which the petitioner and said other persons here are charged with having committed is to be treated as a contempt committed in the immediate view and presence of the state senate, and hence to be covered and controlled by the precise requirements of the first clause in the foregoing section of the code, which, as we have seen, requires that as a prerequisite to the punishment of an alleged offender thereunder ''an order must be made reciting the facts as occurring in such immediate view and presence.'' The foregoing provision of the Code of Civil Procedure appears to have been taken bodily from the original Practice Act adopted during the very early years in the history of California jurisprudence, and to have been contained in identical language in section 481 of said Practice Act [Stats. 1851, p. 127], which required the court in cases of contempt committed in the immediate view and presence of the court to ''make an order reciting the facts as occurring in such immediate view and presence adjudging that the person proceeded against is thereby guilty of contempt.'' The foregoing provision of the Practice Act came under review by this court in the very early case of *Ex parte Rowe, on Habeas Corpus,* 7 Cal. 181, wherein it appeared that the grand jury was inquiring into a certain matter wherein the petitioner was sworn as a witness and certain questions propounded to him which he refused to answer, and that the facts were thereupon presented to the court by the grand jury and the petitioner required by the court to answer, and, upon his refusal then and there so to do, he was committed for contempt. The order of the court recited that the petitioner was committed for contempt in ''refusing to answer certain questions propounded to him by the grand jury.'' What these questions were did not appear upon the face of said order otherwise than as above set forth. Upon his application for a writ petitioner was

discharged, and the court in ordering his discharge said: "In requiring that the act to be performed should be specified in the warrant of commitment the statute must have had some object in view. What could that object be except to afford the means of judging of its correctness by other courts? . . . In the present case it should have been stated that the grand jury were inquiring into a certain question, stating it, that the prisoner was sworn as a witness and certain questions propounded to him, stating them, that he refused to answer, that the facts were thereupon presented to the court by the grand jury and the prisoner required by the court to answer, which being refused he was committed for a contempt."

The foregoing decision in this early case has been expressly approved by this court in later cases, notably in *Ex parte Clarke,* 126 Cal. 235, 240, 243 [77 Am. St. Rep. 176, 46 L. R. A. 835, 58 Pac. 546]; *Overend* v. *Superior Court,* 131 Cal. 280, 285 [63 Pac. 372], wherein the precise language quoted from *Ex parte Rowe* is set forth; and by the District Court of Appeal in the matter of *In re Shortridge,* 5 Cal. App. 371, 375 [90 Pac. 478]; and it and the foregoing cases are also quoted with approval in 5 Cal. Jur. 950, wherein it is stated that, "The rule is declared in the code and followed in the decisions that an order adjudging and punishing a contempt committed in the immediate view and presence of the court must contain a recital of the acts constituting the contempt. This requirement is jurisdictional and an order which assumes to punish summarily a direct contempt of court is void unless it shows on its face acts sufficient to constitute a legal contempt. The order must contain a statement of facts equivalent to those which the law says must be incorporated in an affidavit for constructive contempt and such facts must prove the contempt. Mere conclusions are not sufficient. In such cases the rule that presumptions and intendments are to be indulged in support of ordinary judgments does not apply." ▮ In the light of the foregoing provision of the Code of Civil Procedure and of the cases above referred to and which have consistently interpreted its meaning, we are constrained to hold that a witness before a court or any other inquisitorial body who is otherwise orderly and respectful cannot be adjudged guilty of contempt committed in the presence of such tribunal for

his failure or refusal to answer any question or to produce any record, book or paper, in the absence from the order so adjudging him to be guilty of contempt of an express recital of the facts affirmatively showing not only the precise questions which he has declined to answer, or the precisely specified books or papers which he has refused to produce, but also affirmatively setting forth the facts which show the materiality and pertinency of each of these forms of evidence to the issue before the court or other tribunal. █

Bearing in mind this fundamental principal of procedure in contempt cases of this character, when we refer to the order and adjudication of contempt which the senate purported to adopt and enforce in the instant case, we find it to be entirely lacking in that precision of statement which the law requires. It is true that the order in question contains the recital that "In pursuance of said subpoena duly and regularly issued and served said persons appeared before said committee of investigation of this senate and refused and declined to answer certain questions material to the issues, and refused to produce proper books, papers, documents and records required of them, such being in their possession or under their control, and material to said issues, all as more particularly appears from the report of said committee presented to and filed with this senate on March 8th, 1929, and from the supplemental report of said committee filed with this senate on March 11th, 1929, said questions being also set forth in the 'Excerpts from the transcript of testimony' submitted to the senate March 8th, 1929, to which reference is hereby made." We are of the opinion, however, that the mere "reference" which is thus made to the report of the committee and to certain "questions being also set forth in the 'Excerpts from the transcript of testimony' " are and each of them is insufficient to so far embody the content of such report or the "Excerpts from the transcript of testimony" therein contained in the order of commitment as to satisfy the precise requirement of the aforesaid section of the Code of Civil Procedure with respect to what the "recitals" in said order must contain. █ We are further of the opinion that, notwithstanding the original resolution was sufficient in form to justify the investigation which was conducted by said committee, the order of commitment herein should have

shown upon its face that said investigation was so far legislative in character as to have empowered the committee to ask and to have answered the questions propounded by it to the witnesses and to have required the production of the books, records and documents in question. The necessity for such a recital in the order and commitment for contempt is that of showing upon the face of said order the materiality and pertinency of the questions which were put to these several witnesses and which they declined to answer and of the requirement for the production of the books which they refused to produce. We are, therefore, impelled to the conclusion that the order and adjudication of contempt involved in this immediate proceeding, and also in the like proceedings on the part of said other petitioners, is void upon its face. The conclusion thus arrived at renders unnecessary a determination of the several other issues presented and elaborately argued by respective counsel and which have relation to the pertinency and materiality to the inquiry before said committee of those several questions which this petitioner and his fellow petitioners declined to answer, and of the books, records and papers of the respective corporations of which they are officials, and which, in turn, they and each of them refused to produce. We deem this branch of the discussion premature in the state of the record before us and in the face of our foregoing conclusion that the order of contempt and commitment of the petitioner herein is void upon its face.

The aforesaid order is, therefore, vacated and the petitioner herein discharged.

Curtis, J., Shenk, J., and Langdon, J., concurred.

PRESTON, J., Concurring.—I concur in the judgment; also in the splendid outline given of the privileges and powers of a legislative body in search of material for legislative purposes; also in that portion of the opinion which deals with the technical insufficiency of the order of commitment. But I prefer to rest my concurrence mainly upon the ground that in this case the state senate was not pursuing a legislative purpose. Avowedly it was conducting an inquiry into the existence of an unlawful conspiracy in restraint of trade among the cement producers and dealers

in the state for the purpose of basing thereon civil and criminal proceedings in the courts to be inaugurated by the attorney-general in the name of the people of the state. This is the plain and unmistakable import of the resolution itself. In fact, in the preamble of the resolution setting on foot the inquiry is found these words:

" . . . it is necessary that monopolies, trusts and conspiracies in restraint of trade, affecting the prices of commodities, if any exist, be regulated, and the attorney-general of the state requested to take steps to dissolve the same, and prosecute all guilty parties thereto, to the end that the people may have the benefit of lower prices of material by free competitive bidding; . . ."

However, should any doubt occur in the mind of anyone on the matter, it is entirely dispelled by the resolution of commitment, which repeatedly declares the purpose of the investigation to have been "to investigate as to the existence or nonexistence of a reputed illegal combination or conspiracy," or, as again stated therein, the committee was "to discharge its said duty of investigating as to the existence or nonexistence of such reputed illegal combination or conspiracy"; or, again, the purpose may be found in these words: "Whereas, the truth as to the existence or nonexistence of such reputed illegal combination or conspiracy is supposed to rest and be within the knowledge of these said witnesses, or in the proper books, papers, documents, and records required of them, such being in their possession or under their control; . . . "

No argument is required to show that whether a combination exists or does not exist is a judicial question. To say that the existence or nonexistence of criminal conspiracy in the commerce in one article will aid legislation upon the general subject of monopolies in business is to tax credulity to the breaking point. Can it be said that legislation on this subject is necessary if this combination in the cement business exists and is unnecessary if it does not exist or *vice versa?* If in the investigation of a legislative subject such as the regulation of intrastate business witnesses were produced who would give testimony on this subject, such testimony, of course, could not be refused upon the ground that it would also disclose a violation of the law.

But we have no such situation here. The inquiry before us is not clothed with even the pretense that its purpose is a legislative one. The senate is, therefore, in the present proceeding transgressing upon the exclusive province of the judiciary and hence is without jurisdiction under the resolution as framed to pursue the inquiry attempted.

We reach the same conclusion for the same reason if we consider alone the resolution of commitment. Treating the resolution as the pleadings, findings and judgment in a constructive contempt proceeding or treating it as the order of commitment in a proceeding for contempt committed within the presence of the court, the commitment is illegal for all the reasons pointed out in the main opinion and on the ground that none of the questions propounded nor any of the documents sought are material because the inquiry is therein defined as a judicial and not as a legislative one. Hence, in any aspect of the matter, no contempt is shown.