[No. C040237. Third Dist. Aug. 13, 2003.]

JOE A. CARRANCHO et al., Plaintiffs and Appellants, v. CALIFORNIA AIR RESOURCES BOARD et al., Defendants and Respondents.

### COUNSEL

Kronick, Moskovitz, Tiedemann & Girard, Andrew P. Pugno and Daniel J. O'Hanlon for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary Hackenbracht, Assistant Attorney General, and Nicholas Stern, Deputy Attorney General, for Defendants and Respondents.

### OPINION

**RAYE, Acting P. J.**—In 1991 the Legislature enacted a statutory scheme to phase down the practice of burning rice straw left over after harvest and to develop alternative uses for the straw. These alternatives failed to materialize as hoped, and growers had to incorporate almost all of the straw back into the soil, a practice that was costly and contributed to the incidence of rice disease. In 1997 the Legislature amended the statute to suspend until 2000 the gradual reduction in the amount of straw burned. As part of the amendment, state agencies responsible for managing the phasedown were required to develop a plan to divert at least 50 percent of the straw to off-field uses by 2000 and to make a progress report in 1999 to the Legislature on, among other things, progress in achieving that goal.

The rice grower plaintiffs filed a petition for writ of mandate (Code Civ. Proc., § 1085), alleging that the diversion plan and progress report failed to comply with the statute. The petition was denied. Plaintiffs contend the trial court erred in failing to exercise its independent judgment in reviewing the plan and report. They also claim the plan and report were woefully deficient.

We disagree. The statute contemplates that the plan and report, in part, will aid the Legislature in amending statutes. The agencies therefore performed the quasi-legislative function of gathering information and making recommendations in aid of prospective legislation, acts that are reviewed under a deferential standard.

Applying the appropriate standard, we find the relevant documents pass muster, reflecting consideration by the agencies of the relevant factors affecting development of off-field uses for rice straw and demonstrating a rational connection between those factors and the purpose of the statute to divert 50 percent of the straw. Because the contents of the documents were not arbitrary, capricious, or without evidentiary support, we shall affirm the denial of the petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Rice Straw Burning Reduction Act*

The Connelly-Areias-Chandler Rice Straw Burning Reduction Act of 1991 (Health & Saf. Code, § 41865 et seq.),[1] as originally enacted, provided for an annual reduction in the percentage of acres of rice straw that could be burned in the Sacramento Valley Air Basin, from 90 percent in 1992 to 25 percent in 1999. (§ 41865, former subd. (c), Stats. 1991, ch. 787, § 1, p. 3502.) In 2000 and thereafter, all rice straw burning would require a permit issued only where disease had significantly decreased crop yield. (§ 41865, subds. (b)(3), (f), (h) & (i).)[2] Before the act, most rice straw in the Sacramento Valley was burned.

The statute also encouraged the development of "all feasible alternatives to rice straw burning," declaring this to be the intent of the Legislature. (§ 41865, former subd. (n), now subd. (q).) In 1992 the statute was amended to include a further legislative declaration that the restrictions on rice straw burning might create a solid waste disposal problem and the "state should assist local governments and growers in diverting rice straw from landfills by researching and developing diversion options." (§ 41865, former subd. (n), now subd. (p), as added by Stats. 1992, ch. 1207, § 1, p. 5699.)

The state agencies responsible for managing the phasedown, defendants California Air Resources Board (ARB) and the California Department of Food and Agriculture (CDFA) (collectively the agencies), were directed by the statute to form an advisory committee composed of representatives from both public and private sectors to assist in the identification and implementation of alternatives to burning, and to prepare a list of goals for the development of alternative uses for rice straw. (§ 41865, subd. (*l*).)

The agencies were also required, beginning in 1995, to issue a progress report biennially on the phasedown of rice straw burning, including "an economic and environmental assessment, the status of feasible and cost-effective alternatives to rice straw burning, recommendations from the advisory committee on the development of alternatives to rice straw burning, [and] any recommended changes to this section ...." (§ 41865, former subd. (m).)

The initial 1995 progress report (1995 report) defined the problem addressed by the statute. Rice was the most widely grown crop in the Sacramento Valley, with approximately 484,000 acres planted in 1994–1995. After harvesting, typically three tons of rice straw per acre remain, which has

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

[2] This citation is to the original statute as enacted in 1991.

to be cleared for future crops. Burning the rice straw traditionally was the chosen method of disposal because it was relatively easy and inexpensive, and burning effectively controlled rice diseases that can reduce future crop yields. However, emissions of smoke and other pollutants, and their effects on air quality, caused many public complaints, leading to the passage of legislation to reduce the amount of straw that may be burned.

The 1995 report found, among other things, that virtually all of the unburned straw had been incorporated into the soil; that this practice had increased the cost of farming; and that reliance on soil incorporation could increase the incidence of rice disease, which growers reported caused a decline in yield. Assessing alternatives to burning, the 1995 report stated that in the period from 1992 to 1994, there were no alternatives to burning other than soil incorporation and a small amount of composting and erosion control. No off-farm facilities manufactured products containing straw or converted straw to energy. For 1995 through 2000 and beyond, it appeared that heavy reliance on soil incorporation would be necessary. The phasedown legislation did not appropriate funds to stimulate industry, and most proposals for straw use omitted details on costs and methods to overcome the difficulty of removing straw from the field, storing it, and transporting it to any facility for use.

The 1995 report recommended a statutory change to allow the total annual acreage permitted to be burned to remain the same from 1996 through 1999 to allow more time to develop alternatives to burning other than soil incorporation.

In 1997 the statute was amended to repeal the phasedown requirements for 1998 through 2000 and to allow 200,000 acres of rice straw to be burned annually in those years. (§ 41865, subd. (c)(1), as amended by Stats. 1997, ch. 745, § 2.) A 1997 legislative committee comment on the bill to amend the statute mentioned the statement of the author that "a rice disease referred to as 'rice blast' " had appeared in the state's rice fields the year before. (Sen. Com. on Environmental Quality, com. on Sen. Bill No. 318 (1997–1998 Reg. Sess.) as amended Sept. 8, 1997, p. 2.) The author indicated the bill was intended to provide a " 'negotiated solution' " to the need of rice farmers to protect their crops against disease while minimizing the impact on public health. (*Ibid.*) The committee comment noted the recommendation of the agencies in the 1995 report that the phasedown be paused, as well as comments critical of the report, e.g., that there was no evidence of an increased prevalence of rice disease and that the report paid insufficient attention to the health hazards of burning. (*Id.* at p. 4.)

The 1997 amendments to section 41865 revised both the diversion planning and progress report requirements. As amended, section 41865, subdivision (m) (subdivision (m)) directs ARB to produce an implementation plan for diversion of rice straw to alternative uses other than soil incorporation (diversion plan).

Subdivision (m) states: "On or before September 1, 1998, the state board, in consultation with the department, the advisory committee, and the Trade and Commerce Agency, shall develop an implementation plan and a schedule to achieve diversion of not less than 50 percent of rice straw produced toward off-field uses by 2000. Off-field uses may include, but are not limited to, the production of energy and fuels, construction materials, pulp and paper, and livestock feed."

The progress report requirements similarly were revised to incorporate the status of the diversion plan and its target of 50 percent diversion as set forth in section 41865, subdivision (n) (subdivision (n)). Subdivision (n) states: "On or before September 1, 1999, the state board and the department shall jointly report to the Legislature on the progress of the phasedown of, and the identification and implementation of alternatives to, rice straw burning. This report shall include an economic and environmental assessment, the status of feasible and cost-effective alternatives to rice straw burning, recommendations from the advisory committee on the development of alternatives to rice straw burning, the status of the implementation plan and the schedule required by subdivision (m), progress toward achieving the 50 percent diversion goal, any recommended changes to this section, and other issues related to this section. The report shall be updated biennially and transmitted to the Legislature not later than September 1 of each odd-numbered year. The state board may adjust the district burn permit fees specified in subdivision (s) to pay for the preparation of the report and its updates .... It shall be the goal of the state board and the department that the cost of the report and its updates shall not exceed fifty thousand dollars ($50,000)."

*The Pleadings*

ARB issued the diversion plan several months after the statutory due date of September 1, 1998 (§ 41865, subd. (m)), and also failed to meet the September 1, 1999, deadline for the first progress report due under the 1997 amendments (hereafter progress report) (§ 41865, subd. (n)).

Plaintiffs filed a petition for writ of mandate, alleging first that the diversion plan failed to comply with subdivision (m) because the approaches for achieving 50 percent diversion were conceded by ARB in the plan to be

infeasible.[3] Plaintiffs alleged the phasedown was based on the premise that alternative, off-field uses would be developed before burning restrictions took effect in September 2001. Plaintiffs claimed ARB was required to develop a feasible, realistic plan to achieve diversion of rice straw to off-field uses. If ARB could not develop such a plan despite its best efforts, plaintiffs alleged "then the Legislature should be advised by [ARB] that the premise upon which the burning restrictions due to take affect [*sic*] on September 2001 are based is incorrect. Based thereon, the Legislature may choose to reconsider the restrictions ..., including postponing such restrictions until more off-field uses of rice straw are developed." Plaintiffs sought a writ of mandate under Code of Civil Procedure section 1085 compelling ARB to "develop a feasible, realistic implementation plan and schedule for achieving 50 percent diversion of rice straw, or advise the Legislature that they cannot do so."

Plaintiffs' second claim is that the agencies violated subdivision (n) by failing to issue a final version of the 1999 progress report. Plaintiffs alleged the draft report stated that soil incorporation will remain the primary alternative to burning in the next few years and reported the substantial economic costs associated with the phasedown restrictions. They further alleged the final report might recommend changes to the statute, and in light of the slow development of off-field uses for rice straw, "one such amendment could be a postponement of the restrictions due to take effect in September 2001. However, without the report ..., the Legislature is lacking the basic information from [the agencies] regarding the lack of progress in implementation of a feasible diversion plan, or regarding the economic impacts of the phasedown, on which an amendment to the statute would likely be based." Plaintiffs sought a peremptory writ of mandate under Code of Civil Procedure section 1085, compelling defendants to complete the progress report and submit it to the Legislature.

The agencies subsequently submitted the final progress report to the Legislature in November 2000, more than a year after the statutory due date. The report made no recommendations regarding changes to the statute.

Plaintiffs then filed a first amended petition, revising their claims concerning the progress report. Noting that the final version of the progress report and the preliminary draft report were apparently identical, plaintiffs now alleged that the report did not comply with subdivision (n) regarding the subjects required to be addressed in the report, in that its economic and environmental assessment of the phasedown, discussion of the status of the

---

[3] Plaintiffs are Joe A. Carrancho, Bert E. Manuel, and Robert L. Sutton, all alleged to be rice growers. In addition to ARB and CDFA, the defendants named in the petition included the heads of these agencies: Michael Kenny, executive officer of ARB, and William J. Lyons, Jr., secretary of CDFA, sued in their official capacities.

diversion plan, and analysis of the progress toward meeting the 50 percent diversion goal were all deficient.

The amended petition added a third cause of action for declaratory relief, alleging a controversy between the parties as to whether the agencies had complied with subdivisions (m) and (n).

*Discovery*

Plaintiffs served deposition notices pursuant to Code of Civil Procedure section 2025, subdivision (b), seeking the persons most knowledgeable at ARB and CDFA about research, preparation, development, drafting, review, and issuance of the diversion plan and the progress report. The agencies moved for a protective order, arguing that deposition testimony would not be admissible or lead to the discovery of admissible evidence because in a mandamus proceeding only the administrative record would be admissible pursuant to *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States Petroleum*).

The trial court granted the motion on the ground urged and further ruled on the related issue of the standard of review applicable to the subject matter at bar: "[T]he standard for review at trial in this matter would be whether [the agencies'] actions were arbitrary, capricious or wholly lacking in evidentiary support, and having done that, the General Rule applies that ... the review is limited generally to the administrative record."

ARB lodged a 15-volume administrative record for the diversion plan and progress report. CDFA lodged a five-volume record regarding the progress report.

*The Trial Court's Decision*

After a hearing, the court issued a written ruling and entered judgment denying the petition. The judgment states that ARB had not failed to comply with subdivision (m) and that ARB and CDFA had submitted the progress report beyond the due date set forth in subdivision (n) but had not failed to comply with that section as to the contents of the report.

Plaintiffs filed a timely appeal.

## DISCUSSION

### I. STANDARD OF REVIEW

■ An ordinary mandamus action under Code of Civil Procedure section 1085 permits judicial review of ministerial duties as well as quasi-legislative

acts of public agencies. (*County of Del Norte v. City of Crescent City* (1999) 71 Cal.App.4th 965, 972 [84 Cal.Rptr.2d 179].) Mandamus lies to compel the performance of a clear, present, and ministerial duty where the petitioner has a beneficial right to performance of that duty. (*Ibid.*) ■ Mandamus may issue to correct the exercise of discretionary legislative power, *but only* if the action taken is so palpably unreasonable and arbitrary as to show an abuse of discretion as a matter of law. This is a highly deferential test. (*Id.* at pp. 972–973.)

As stated by the California Supreme Court: "In reviewing such quasi-legislative decisions, the trial court does not inquire whether, if it had power to act in the first instance, it would have taken the action taken by the administrative agency. The authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168].) The court in *Western States Petroleum* refers to this formulation as the " 'arbitrary and capricious' standard." (*Western States Petroleum, supra,* 9 Cal.4th at p. 574.) In applying this deferential test, a court " 'must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' " (*Id.* at p. 577, quoting *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31] (*California Hotel & Motel Assn.*); see also *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 230 [1 Cal.Rptr.2d 818] (*Shapell Industries*).) Courts exercise limited review "out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority." (*California Hotel & Motel Assn., supra,* 25 Cal.3d at p. 212; *Shapell Industries, supra,* 1 Cal.App.4th at p. 230.) The court does not "weigh the evidence adduced before the administrative agency or substitute its judgment for that of the agency, for to do so would frustrate legislative mandate." (*Shapell Industries, supra,* 1 Cal.App.4th at p. 230.)

■ As plaintiffs remind us, the standard of review can vary depending on the nature of the agency's action. As our Supreme Court has stated: " 'The appropriate degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' " (*Shapell Industries, supra,* 1 Cal.App.4th at p. 232.) Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions

do not merit such deference, and therefore lie toward the opposite end of the continuum." (*Western States Petroleum, supra,* 9 Cal.4th at pp. 575–576.)

■ In most cases, the appellate court must determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty entitled to a considerable degree of deference. This question is generally subject to de novo review on appeal because it is one of statutory interpretation, a question of law for the court. (See *Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50] (*Rodriguez*); *California Teachers Assn. v. Ingwerson* (1996) 46 Cal.App.4th 860, 865 [53 Cal.Rptr.2d 917]; *Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 752 [85 Cal.Rptr.2d 512] (*Transdyn/Cresci*).) In this instance, the nature of the agencies' actions in preparing the diversion plan and progress report is dependent upon a judicial interpretation of subdivisions (n) and (m). We therefore determine independently, based on these provisions, the proper standard of review to apply.

Plaintiffs claim the deferential standard was wrongly applied here because the agencies' actions in preparing the diversion plan and progress report were informal and nonlegislative. They insist that only rulemaking is quasi-legislative.

■ To be sure, the formulation and adoption of rules is the clearest example of a quasi-legislative function performed by an agency, a form of substantive lawmaking delegated by the Legislature. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10–11 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha Corp.*).) But investigation and information gathering in aid of, or as a basis for, prospective legislation is another legislative function that may be accomplished through administrative agencies. (See *In re Battelle* (1929) 207 Cal. 227, 241 [277 P. 725]; *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 62–63 [112 Cal.Rptr.2d 5]; see also 2 Cal.Jur.3d (1999) Administrative Law, § 285, p. 308 ["Fact-finding for the purpose of supplying the legislature with information on which to base general legislative action is obviously legislative, the determination of facts and formulation of legislative policy being the very core of the legislative function"].) In authorizing administrative agencies to investigate, hold hearings, and report findings, the Legislature is, in effect, using those agencies as an "arm" of the Legislature itself, performing functions that are quasi-legislative in nature.

We conclude the statutory provisions directing the agencies to develop and prepare a diversion plan and progress report are within this category of quasi-legislative acts. Subdivision (m) requires ARB to develop an implementation plan and schedule to achieve diversion of 50 percent of the rice straw

to off-field uses by 2000. Subdivision (n) instructs ARB and CDFA to report on, among other things, "the status of the implementation plan and the schedule required by subdivision (m), progress toward achieving the 50 percent diversion goal, [and] any recommended changes to this section ...." Read together, these subdivisions reveal a legislative purpose that ARB and CDFA assemble the information and summarize the facts included in both the diversion plan and progress report in part to recommend changes to the statute. Indeed, history shows that the 1995 progress report did recommend statutory changes based on findings derived from the information contained therein; the Legislature subsequently considered these recommendations when it amended the statute. ■ While this is not as clear a case as rulemaking, the preparation of the diversion plan and the progress report must be considered quasi-legislative acts.

Plaintiffs argue that since the agencies were involved in *"implementation* of the Legislature's directive under clear substantive requirements," they were operating pursuant to a "ministerial duty subject to control by mandate."

"A ministerial act is an act that a public officer is required to perform *in a prescribed manner in obedience to the mandate* of legal authority *and without regard to his own judgment or opinion concerning such act's propriety or impropriety*, when a given state of facts exists. Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment." (*Rodriguez, supra*, 1 Cal.App.4th at pp. 501–502, italics added; *Transdyn/Cresci, supra*, 72 Cal.App.4th at p. 752.) Thus, "[w]here a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, that course of conduct becomes mandatory and eliminates any element of discretion." (*Great Western Sav. & Loan Assn. v. City of Los Angeles* (1973) 31 Cal.App.3d 403, 413 [107 Cal.Rptr. 359].)

Plaintiffs are wrong in concluding that ARB and CDFA "need exercise *no* judgment or discretion in determining whether to issue the Diversion Plan and Progress Report and the subjects to be addressed in each (they are spelled out in statute) ...." Subdivision (m) mandates that ARB, in conjunction with other agencies, "develop an implementation plan and a schedule to achieve diversion of not less than 50 percent of rice straw produced toward off-field uses by 2000. Off-field uses may include, but are not limited to, the production of energy and fuels, construction materials, pulp and paper, and livestock feed." The statute thus directs the agency to prepare a plan designed to achieve a generalized goal and mentions a few suggested areas to explore. But the specifics of the plan are left entirely to the agency. This is inconsistent with a ministerial duty, which requires no judgment or discretion.

Similarly, the language of subdivision (n), which requires the agencies to issue a progress report on the phasedown of rice straw burning and identification and implementation of alternatives to burning, directs them to prepare a report including "an economic and environmental assessment, the status of feasible and cost-effective alternatives to rice straw burning, recommendations from the advisory committee on the development of alternatives to rice straw burning, *the status of the implementation plan* and the schedule required by subdivision (m), *progress toward achieving the 50 percent diversion goal,* any recommended changes to this section, and other issues related to this section." (Italics added.) This section clearly indicates the Legislature viewed the 50 percent diversion figure as a goal to aim for, not a result that could be automatically achieved by blind obedience to a legislative command. Furthermore, the Legislature would obviously be seeking guidance from the agencies' findings and recommendations when the time came to consider amending the applicable statutes.

██ From the foregoing, it can be seen that subdivisions (m) and (n) do not eliminate agency discretion but require it. These provisions do not indicate either the approach to be taken or, in the case of the progress report, the conclusion to be reached. All the details critical to the undertaking are committed to agency judgment, e.g., which uses to endorse or emphasize, how to encourage such uses, and how to deal with the difficulties in achieving the goal of 50 percent diversion.

Even plaintiffs concede that the conclusion and recommendation they candidly seek in this action—a suspension of the phasedown because feasible alternatives have not been developed—"probably cannot be mandated by this Court, as ultimate recommendations are within Respondents' sole discretion." We fail to see how the conclusions and recommendations of a report could be a matter of discretion while the investigative work, evidence gathering, and deductive reasoning leading to those conclusions are entirely ministerial. To the contrary, it appears that the entire enterprise involves "balancing various factors and selecting among various approaches to the same problem," the hallmarks of discretionary acts. (*Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1562 [55 Cal.Rptr.2d 465].)

██ Traditional mandamus may be used to compel an agency to exercise its discretion but not to control it, i.e., to force the exercise of discretion in a particular manner or to reach a particular result. (See 8 Witkin, Cal. Procedure (8th ed. 1997) Extraordinary Writs, §§ 91, 93, pp. 879–880, 883–884 and cases cited therein.) We conclude that developing the diversion plan and preparing the progress report pursuant to subdivisions (m) and (n) fell on the deferential end of the continuum accorded quasi-legislative agency action. Thus, while plaintiffs could (as they initially did) compel the agencies to

*issue* the statutorily required documents, since the manner of preparation and the contents are left to the discretion of the agencies involved, review is limited to determination whether the findings, conclusions, and recommendations were arbitrary, capricious, or unsupported by substantial evidence. (*California Hotel & Motel Assn., supra*, 25 Cal.3d at p. 212.)

## II. EXTRA-RECORD EVIDENCE

Plaintiffs contend the trial court erred in ruling that evidence outside the administrative record was inadmissible in this action. They are wrong.

An unbroken line of cases holds that, in traditional mandamus actions challenging quasi-legislative administrative decisions, evidence outside the administrative record (extra-record evidence) is not admissible. (*Western States Petroleum, supra*, 9 Cal.4th at p. 574; *Shapell Industries, supra*, 1 Cal.App.4th at pp. 230–234.) However, the Supreme Court said in *Western States Petroleum* that since "informal actions" are not entitled to judicial deference, "we will continue to allow admission of extra-record evidence in traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute." (*Western States Petroleum, supra*, 9 Cal.4th at p. 576.) The court was persuaded by commentators who pointed out that "the administrative record developed during the quasi-legislative process is usually adequate to allow the courts to review the decision without recourse to such evidence," and that "extra-record evidence is usually necessary only when the courts are asked to review ministerial or informal administrative actions, because there is often little or no administrative record in such cases." (*Id.* at p. 575.)

Plaintiffs seize on this language to argue both that the trial court erred in granting the agencies' motion for protective order and that it incorrectly applied a deferential standard of review in this action. They contend that "performance of [the agencies'] mandatory duties here are [*sic*] clearly 'informal' in contrast to formal rule-making functions ...."

The court in *Western States Petroleum* did not define the characteristics of an "informal" agency action, but the commentators it cited (*Western States Petroleum, supra*, 9 Cal.4th at p. 575) indicate "informal" actions are those that do not involve a hearing: "When a CCP § 1085 ordinary mandamus proceeding is brought to challenge an administrative decision made without a hearing, if the facts are in dispute, a reviewing court is not limited to the record of the agency's proceedings. In the absence of a hearing, the record documenting the agency's action will not provide an adequate basis for judicial review. In such a case a reviewing court may hear extra-record evidence." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2003) Judicial Review, § 23.52, pp. 969–970.)

The informal action exception does not apply here. While it is true that neither agency held a formal hearing before developing the diversion plan or issuing the progress report (nor were they required to), there were public meetings, workshops, and ample opportunity for input from the public. ARB consulted with an advisory committee comprised of rice growers (including plaintiffs themselves), a business community expert in market or product development, and public officials. In gathering information for the progress report, the agencies held two public workshops in addition to individual meetings with interested parties. The progress report was issued in draft form for public comment, and the comments were included in the administrative record and summarized in the report. Those efforts led to the generation of a combined administrative record for the diversion plan and progress report that exceeds 5,000 pages.

In *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383 [61 Cal.Rptr.2d 297] (*Friends of the Old Trees*), a plaintiff that was challenging administrative approval of a timber harvest plan contended extra-record evidence was admissible because the agency's action "was simply an 'informal' administrative decision made as a result of a proceeding which did not require the taking of evidence or a verbatim transcript of the proceedings." (*Id.* at p. 1391.) The court rejected this characterization, observing that the agency's decision "was not made in a bureaucratic vacuum leaving an inadequate paper trail, as the 600-plus page administrative record demonstrates." (*Ibid.*) The appellate court also saw it as significant that the approval process provided numerous opportunities for public and agency input. (*Id.* at pp. 1391–1392.)[4]

As in *Friends of the Old Trees*, here there was opportunity for public input as well as the generation of an extensive administrative record. Because the agencies' actions here were neither informal nor ministerial, the rule applies that extra-record evidence is inadmissible in traditional mandamus proceedings challenging quasi-legislative acts. (*Western States Petroleum, supra,* 9 Cal.4th at p. 575; *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 117–118 [99 Cal.Rptr.2d 378].) We agree with the agencies

---

[4] Plaintiffs attempt to distinguish *Friends of the Old Trees* because the court also found that "purely documentary proceedings" satisfied the hearing requirement for administrative mandate under Code of Civil Procedure section 1094.5. (*Friends of the Old Trees, supra,* 52 Cal.App.4th at p. 1391.) Plaintiffs argue that by seeking and accepting public input from various sources when they were not required to do so, ARB and CDFA subjected their actions to "informal" scrutiny, because no law compelled the agencies to follow this course. We are unpersuaded. This is a traditional mandamus action. Particular factors that would obviate the need for a hearing normally required for review under the *administrative mandamus* statute are of no assistance in assessing whether administrative agency action is formal or informal in a traditional mandamus context.

that allowing extra-record evidence under these circumstances would encourage interested parties to withhold important evidence at the administrative level so as to use it more effectively to undermine the agency's action in court. The trial court correctly ruled that extra-record evidence was not admissible. Our review is properly confined to the administrative record.

## III. DIVERSION PLAN

Plaintiffs claim the diversion plan did not comply with subdivision (m) in two basic ways: (1) It only recommended legislative action, and (2) it was not feasible or realistic. As will be shown, neither contention has merit.

Plaintiffs contend that "under the correct interpretation of ARB's duty set forth in subdivision (m) of the Act, the Diversion Plan ARB issued is contrary to law because it consists almost entirely of just *recommendations* to the Legislature for further legislative action, rather than constituting 'an implementation plan ... to achieve diversion of not less than 50 percent of rice straw produced,' as the Act requires."

Subdivision (m) directs ARB to "develop an implementation plan and a schedule to achieve diversion of not less than 50 percent of rice straw produced toward off-field uses by 2000." The diversion plan sets forth a combination of approaches to meet this goal by 2000 but contains many caveats, including the observation that the Legislature would have to appropriate funds and commit the state to certain uses of rice straw.[5] The plan also concluded that the approaches presented were not practical because they did not embody a permanent, long-term solution.

---

[5] By way of illustration, the approaches set forth included: "Straw Infrastructure Development [¶] Funds would need to be appropriated to develop the infrastructure needed for using 562,500 tons of straw .... [¶] Erosion Control [¶] There currently exists a market for rice straw ... as erosion control material. This market could be increased ten fold by promoting, or even requiring, state and local agencies to use rice straw for erosion control. Developing a marketing plan targeting the construction industry would also increase the use of rice straw for erosion control.... Funds would need to be appropriated to develop the marketing plan and storage facilities.... [¶] Sound Walls [¶] The California Department of Transportation ... and the Integrated Waste Management Board have made plans to build a demonstration sound wall using rice straw. If the results of the demonstration project are positive, the State could make a commitment to use rice straw to build a significant percentage of future sound walls, using up to about 3,000 tons of straw annually. [¶] ... [¶] Animal Feed [¶] ... In 1997, there were 6 dairy and cattle ranchers who purchased approximately 1,860 tons of rice straw for animal feed, using the $15 per ton State Tax Credit to offset the cost of transporting the straw to the San Joaquin Valley. To increase this usage over 260-fold, to 490,000 tons, the tax credit may have to be increased to $20 per ton."

Based on these facts, plaintiffs claim ARB merely "punt[ed]" the issue back to the Legislature by issuing a plan that largely relies on recommendations, and that the agency abdicated its responsibility to come up with a practical and realistic plan for diversion.

At the outset, we take issue with plaintiffs' assertion that their argument raises a question of statutory interpretation requiring de novo review. It is true that ultimate responsibility for construction of a statute rests with the courts. (*Yamaha Corp.*, *supra*, 19 Cal.4th at p. 12.) Nevertheless, the diversion plan was not an interpretation of statutory language—it was an effort to effectuate a statutory purpose. ▮ A court passing on the means employed by an agency to effectuate a statutory purpose will not substitute its judgment for that of the agency in the absence of arbitrary and capricious action. (*Ralphs Grocery Co. v. Reimel* (1968) 69 Cal.2d 172, 179 [70 Cal.Rptr. 407, 444 P.2d 79] (*Ralphs Grocery*).)

▮ Moreover, the statute's language does not prohibit a call for legislative action as part of the implementation plan, nor does it require ARB to achieve the 50 percent diversion unaided by the Legislature. Even accepting, for purposes of argument, plaintiffs' assertion that subdivision (m) requires ARB not only to develop a plan but also to implement it, if, as is stated in the plan and not disputed by plaintiffs, the methods using only the private sector have not been effective in achieving the goal of 50 percent diversion, a plan calling for legislative action to create public incentives for commercial use and/or legislative mandate for public use of rice straw is a rational means to effectuate the statutory purpose.

After all, the statute contains a declaration that "[t]*he state* should assist local governments and growers in diverting rice straw from landfills by researching and developing diversion options." (§ 41865, subd. (p)(2), italics added.) It cannot reasonably be maintained (though plaintiffs do) that the term "state" means only ARB and not the Legislature. Therefore, the Legislature was a participant in the effort to develop alternative uses for rice straw. Indeed, as the diversion plan indicates, the Legislature already had enacted a tax credit and grant program to stimulate off-field uses of rice straw. The plan in part recommended legislative expansion of existing legislative programs to achieve the legislative goal. This approach was not arbitrary, capricious, or in conflict with the language of the statute.

Plaintiffs also contend ARB failed to perform its mandatory duty because the diversion plan it developed is infeasible, arbitrary, and unrealistic. Despite plaintiffs' attempt to insert more stringent standards of review into the discussion, their attack on the feasibility of the plan is nothing more than a challenge to its worth in effectuating the statutory purpose, which we review

under a deferential standard to determine whether the agency's action was arbitrary or capricious. (*Ralphs Grocery, supra,* 69 Cal.2d at p. 179.)

Plaintiffs' claim fails because it consists of misreadings of what the plan said. They direct our attention to the conclusion stated at the end of the plan that ARB "does not believe that these approaches are practical, since they would not work towards a permanent, long-term solution to using over a half-a-million tons of straw annually." We read this statement to mean that ARB does not favor a short-term solution that might achieve the goal of 50 percent diversion by 2000 but be unable to sustain it in the long run. In other words, the language does not comment on the lack of feasibility of the plan in meeting the diversion goal in 2000 but on its viability as a long-term solution. ARB's misgivings on that score led it to propose an alternative plan to divert 50 percent of rice straw to off-field uses by 2003.[6] Nor was it arbitrary, capricious, or inconsistent with its statutory mandate for ARB to acknowledge the deficiencies in its short-term plan and to recommend a legislative solution more sustainable over the long term.

Plaintiffs argue the plan was infeasible because ARB observed in its text that "[i]f the Legislature were to implement additional measures, the earliest, practical date by which resources could be appropriated would during [*sic*] late 1999 or early 2000. This would allow only about 9 months to develop and implement programs that could affect the September 2000 straw harvest. There are very few straw usage categories which could be targeted in such a short time frame." Again, we do not understand ARB to be conceding that the plan cannot realistically be accomplished, but rather that it was highlighting the difficulty of implementing the plan given the short time frame and the limited alternative uses that could be implemented during that period.

 Aside from semantic niceties, it is clear the function of judicial review of discretionary actions of an administrative agency is to "ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the

---

[6] ARB said "[b]ecause of the extreme difficulty and high cost of achieving a 50 percent diversion by the year 2000, the ARB also identified an alternative plan targeted at the year 2003." ARB concluded that a diversion plan for 2003 was preferable in part because additional uses, such as ethanol conversion, could be developed by that time. Plaintiffs attack the alternative plan as well for being infeasible, unrealistic, and arbitrary. We need not address this contention because ARB effectuated the statutory purpose by issuing the plan for 2000. The asserted infeasibility of the alternative plan does not bear on the pertinent issue of whether the 2000 plan was arbitrary or capricious as a means to effectuate the statutory purpose. (*Ralphs Grocery, supra,* 69 Cal.2d at p. 179.) We need not and do not decide whether ARB could comply with subdivision (m) by developing *only* a plan for achieving 50 percent diversion of rice straw to off-field uses by 2003.

purposes of the enabling statute." (*California Hotel & Motel Assn., supra,* 25 Cal.3d at p. 212.) We exercise deferential, but not perfunctory, review. (*Id.* at pp. 212–213, fn. 30.)

The diversion plan passes this test. The plan adequately considered the relevant factors of the current, very limited amount of off-field rice straw use; the twentyfold increase in such use needed to achieve 50 percent diversion by 2000; and the limited uses that could be developed or expanded in that time frame. To call for legislative action in the plan to stimulate this increase is a choice rationally related to those factors and the purpose of the enabling statute, which required a plan for 50 percent diversion by 2000 but did not specify the approaches to take or the methodology to be used.

The supporting evidence referenced in the plan included a report by the advisory committee formed pursuant to section 41865, subdivision (*l*), which ARB was required to consult in developing the plan. (§ 41865, subd. (m).) The Report of the Advisory Committee on Alternatives to Rice Straw Burning (Oct. 1997) made specific, short-term recommendations to achieve the statutory diversion goal, which included, inter alia, amending the rice straw tax credit and budgeting funds for state agencies other than ARB or CDFA to make rice straw available for erosion control and fire rehabilitation. In short, the committee report supported the plan's conclusion that further legislative action was needed to achieve the Legislature's rice straw diversion goals.[7] If the diversion plan did not contain a sure-fire solution to the problem, it was the result of external conditions encountered by ARB, not the dereliction of its duty in preparing the plan.

## IV. PROGRESS REPORT

With respect to the progress report, plaintiffs contend (1) that the trial court's findings do not support its decision, and (2) that the report fails to comply with the requirements of subdivision (n).

*Trial Court Findings*

Plaintiffs target two statements made by the trial court about the report as a basis for reversal. The trial court said: (1) "As petitioners point out, some of the information or data upon which [the report] is based does appear to be several years old"; and (2) "Further, the progress report is not very detailed or explicit in describing the status of the implementation plan and schedule and the progress—or, in petitioners' view, lack of actual progress—towards

---

[7] Additionally, an October 22, 1998, comment letter on the draft plan from the California Trade and Commerce Agency, with which ARB is also required to consult in developing the plan (§ 41865, subd. (m)), agreed the tax credit should be modified to develop a straw market.

achieving the 50 percent diversion goal. These issues could have been covered more explicitly and in greater detail in the progress report."

Plaintiffs' apparent claim that these comments or "findings" by the trial court require reversal of the judgment is spurious. In two places in the opening brief (including the page that follows this contention), plaintiffs recite the established rule that the trial court's findings have no effect on appellate review of the reasonableness of agency action. "In a mandamus proceeding, the *ultimate question,* whether the agency's action was arbitrary or capricious, *is a question of law.* [Citations.] Trial and appellate courts therefore perform the same function and the trial court's statement of decision has no conclusive effect upon us." (*Shapell Industries, supra,* 1 Cal.App.4th at p. 233, italics added; accord, *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892]; *Personnel Com. v. Board of Education* (1990) 223 Cal.App.3d 1463, 1466 [273 Cal.Rptr. 288].) "We are not undertaking a review of the trial court's findings or conclusions. Instead, 'we review the matter *without reference to the trial court's actions.* In mandamus actions, the trial court and appellate court perform the same function ....' [Citations.]" (*Friends of the Old Trees, supra,* 52 Cal.App.4th at p. 1393.)

Plaintiffs cannot rely on the written comments of the trial court as a basis for reversal and at the same time advise us to disregard them.

*Economic and Environmental Assessment, Status of Diversion*

Subdivision (n) requires ARB and CDFA to include in the report to the Legislature "an economic and environmental assessment, ... the status of the implementation plan and the schedule required by subdivision (m), [and] progress toward achieving the 50 percent diversion goal ...."

Plaintiffs put forward the combined argument that "the Progress Report makes only an arbitrary, hypothetical assessment of the economic impact of increased disease and decreased yields caused by repeated incorporation of rice straw into the soil; refers to but *fails to assess* University of California study findings that incorporation causes disease that may reduce yields; and arbitrarily asks the Legislature for funding to research economic impacts of reduced yields despite already having discretionary authority to assess fees to pay for such research." We review de novo the report's treatment of these topics to determine whether the agencies' actions were arbitrary, capricious, or lacking in evidentiary support. (See, e.g., *Friends of the Old Trees, supra,* 52 Cal.App.4th at p. 1393.)

*Economic Assessment*

Plaintiffs complain that the progress report is "dismissive and cursory." Specifically, they criticize the statement in the report that "[c]urrently, it is not known to what extent repeated [soil] incorporation decreases yields" as inconsistent with the executive summary of the report, which states: "[A]ccording to studies by the University of California, Davis, [soil incorporation] causes an increase in rice diseases and weeds which may cause a reduction in yields."

We see no conflict. The second statement notes that soil incorporation causes rice disease, which *may* cause decreased yield, but says nothing about the *extent* of decreased yield. Therefore, it is not inconsistent with the first statement, which says that the precise extent of yield decrease due to soil incorporation is not yet known.

Plaintiffs also fault the report for failing to relate the findings or analyze the university studies. We conclude the report accurately tracks the study findings, which offer little or no solid evidence to analyze. The current university study stated: "[M]any growers are reporting increased disease which they feel is damaging their rice. In the past two seasons average yields in California have been down dramatically and many question to what extent straw is responsible. Evidence suggests that disease levels are higher, and since this is related to straw management, there is undoubtedly some impact on yield. *To what extent low yields are direct effect of straw or weather or both is a matter of conjecture.*" (Italics added.) The progress report thus reflects the university study: There appears to be a correlation between soil incorporation of rice straw on the one hand and disease resulting in lower yield on the other, but the certainty of a cause-and-effect relationship, let alone its quantification, is as yet unknown.

Plaintiffs next complain that the report's estimate that lost yield was 10 percent and the overall revenue reduction was $24 million in the Sacramento Valley was lacking in adequate discussion or evidentiary support. However, the basis for the percentage estimate of lost yield is indicated on the same page as the statement. A rough chart from historic rice yield data in California supplied by the United States Department of Agriculture showed the yield dropping in the 1998–1999 period from above 8,000 pounds per acre to below 7,000 pounds per acre. During this period, of course, the burning phasedown was suspended. (§ 41865, subd. (c)(1).) A loss from 8,000 to 7,000 pounds would be 12.5 percent. The period from 1996 to 1998 showed an increase from about 7,500 pounds to above 8,000 pounds per acre. An increase in yield from 7,500 to 8,000 pounds would be 15 percent. The staff estimate of reduction in yield was evidently an attempt to project a rough

average of these fluctuating trends, leaning in the direction of significant reduced yield in the future when rice straw burning restrictions would be greatest. Without supplying the arithmetic, the estimated reduction could be based on the number of acres where soil incorporation would be required, the revenue per acre, and the percentage reduction in yield. We agree with the trial court that while these estimates could have been more detailed and explicit, they were neither arbitrary nor unsupported by evidence.[8]

Plaintiffs further contend the economic assessment of reduced yield due to soil incorporation of rice straw was flawed because the report recommended the Legislature fund research on the subject. Plaintiffs' position is that the two agencies were able to do the research themselves and had the funding to do so, in that subdivision (n) authorizes ARB to adjust straw burning permit fees to pay for preparation of the report.

This argument is unpersuasive. Subdivision (n) states the legislative goal is that the cost of "the report and its updates" every two years shall not exceed $50,000. It is unreasonable to suggest that this funding level for a series of reports was designed to support original research. Historically, as the 1999 progress report indicated, the principal research on the economic effects of the reduction in rice straw burning relied on by ARB and CDFA in reporting to the Legislature had been done by academic institutions. It was reasonable to ask the Legislature to fund further needed research and study, especially where the agencies themselves were restricted by statute from generating fee revenue sufficient for this purpose.

Plaintiffs assert the progress report lacks adequate discussion of the cost of soil incorporation because the cost was expressed as an average for acres where straw was incorporated, ignoring the wide disparity in costs. They further assert the cost is miscalculated when expressed as a rounded average for all acres planted with rice. On the first point, the report set forth the range of costs ($8 to $77) per acre, so the inclusion of an overall average based on this range ($36.31) to calculate the overall impact of soil incorporation was not arbitrary. Plaintiffs' contention that the report should have included a cost assessment by soil types must be rejected because it invites the court to involve itself in technical matters (i.e., the correct statistical method to employ), whereas our high court has made it clear agencies should be given wide latitude to solve such problems without judicial interference. (*Industrial*

---

[8] While we do not find the estimation process unaccountable, the technical nature of projecting agricultural yields and revenue demonstrates the wisdom of our high court's warning that " 'in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and officers work out their problems with as little judicial interference as possible.' " (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579] (*Industrial Welfare Com.*).)

*Welfare Com., supra,* 27 Cal.3d at p. 702.) The errors plaintiffs detect in the calculation of the average cost of soil incorporation expressed over all acres planted, including those where straw is burned, have little impact on the ultimate figure ($20 per acre versus $21.51 per acre), as the agencies demonstrate and plaintiffs do not dispute. We agree with the agencies that it was not arbitrary to express this average as a rounded number given the variation in costs and inherent lack of precision in data regarding the cost of soil incorporation of rice straw per acre.

We conclude that the asserted defects plaintiffs list in the economic assessment in the progress report did not render the assessment arbitrary or lacking in evidentiary support.

### Environmental Assessment

In plaintiffs' view, the environmental assessment in the progress report is inadequate because it analyzes the decreased air emissions from the reduction in rice straw burning but does not assess *"other, adverse* environmental effects resulting from the change in rice straw management made necessary by the phase-down ...." The report lists these nonemission effects and concludes there is insufficient data to assess them. Plaintiffs assert the progress report "thus presents a lopsided view of the environmental impacts of the phasedown, and ignores significant adverse impacts." Further, plaintiffs reject defendants' declaration that the data did not exist, finding an inconsistency with another statement in the report indicating the agencies had not worked to identify the data on environmental effects other than emissions.

Once again, plaintiffs invite this court to wade into a debate about the proper way to present technical theory, analysis, and data (or lack of it). In this instance, it was reported in the executive summary of the progress report: "From an overall air quality standpoint, the phase down has had a positive public health and environmental impact due to reduced air emissions. However, some growers have indicated that there may be adverse environmental effects resulting from the change in rice straw management practices and the variety of techniques employed. These include: effects on water quality and use, increased methane emissions contributing to global warming, flooding potential, additional fuel use, additional use of pesticides and herbicides, and effects on waterfowl and pheasant habitats during winter. However, the ARB and CDFA staff currently have insufficient data available to adequately assess these effects. Staff will work with stakeholders to identify the available information on potential environmental effects and evaluate the need to conduct additional research."

This passage of the report did not evince an arbitrary abdication of the responsibility to conduct an environmental assessment. Review of the report

and the record reveals the adverse environmental effects attributed to straw management other than burning were brought to the attention of ARB staff as comments from rice growers on the draft report.[9] The comments did not indicate any data, research, study, or other source of information that reflected these effects. In discussing the comments, staff concluded the effects existed but their impact was poorly understood, indicating (as the report states) that agency staff did not have data available to assess the impact. At that point in the process, there was insufficient information or research on the multifarious nonemission adverse environmental impacts of rice straw management other than burning. It was reasonable for the agencies to include what scant environmental data was available, i.e., the specific environmental effects brought up by growers, and to state the intention to seek further information to determine whether more research is needed on these effects.

### Diversion Plan Status

Plaintiffs contend the agencies failed to report on the "status of the implementation plan and the schedule required by subdivision (m)" as required by subdivision (n). Plaintiffs concede the report contained a section on the status of the diversion plan but insist the discussion was deficient because it consisted of a description of the plan and recommendations for legislative action, followed by a conclusion that "[t]o date, no legislative appropriations have been made to provide the economic incentives needed to substantially expand the use of rice straw."

Since action by the Legislature was a necessary component of the plan, the comment that it had not occurred effectively accurately indicated the status of the diversion plan. The agencies did not act arbitrarily by conveying to the Legislature that the diversion plan was a nonstarter because of the absence of legislative appropriation.[10]

### 50 Percent Diversion Progress

Subdivision (n) requires ARB and CDFA to report to the Legislature, not only on the status of the diversion plan but also on "progress toward achieving the 50 percent diversion goal ...." Again, plaintiffs do not assert

---

[9] The "Public Comments on the Phase Down" section of the report stated that "[s]ome growers have also expressed concerns about the unknown environmental effects of the change in rice straw management." These concerns were set out in somewhat greater detail than in the summary (e.g., "additional winter water consumption for flooding fields to decompose straw, with concerns about water availability during drought years").

[10] Many of plaintiffs' objections to the progress report concern its failure to indicate the status of aspects of ARB's alternative strategy to achieve 50 percent diversion by 2003. These objections are beside the point since the plan included a strategy to achieve 50 percent diversion by 2000 as subdivision (n) required.

that this topic is missing from the report but, rather, assert that it was inadequately treated. Plaintiffs fault the report because it discussed developments for alternative uses of rice straw but failed to state the degree to which such uses are contributing to or gaining ground on the goal of 50 percent diversion to off-field uses. Plaintiffs also criticize the report for estimating in the near term that 5 to 10 percent of rice straw would be used off-field by 2001 without sufficient findings to support the estimate, and for stating that off-field use could be expected to increase to 20 percent by 2003 without indicating the degree of progress being made toward that goal.

The arguments must be rejected. Subdivision (n) requires the agencies to report on the progress in achieving the diversion goal. On this point, the report plainly noted the lack of progress over the two-year reporting period, concluding: "Despite [programs to stimulate alternative uses over the last two years], alternatives uses have not materialized as quickly as hoped. Effective alternatives are critical to the long term success of the phase down. Currently, about 97 percent of the rice straw that is not burned is incorporated into the soil." This statement complied with the legislative directive.

Finally, plaintiffs accuse the agencies of misleading the Legislature by making statements indicating that diversion efforts were progressing well. Despite isolated optimistic statements, however, the bottom line of the report concerning feasible alternative use projects was negative: Alternative, off-field uses for rice straw consumed only 3 percent of the total. The Legislature could not have been misled.

To the extent plaintiffs filed this action to obtain a plan and report that would recommend to the Legislature (as they did in 1995) that poor progress warranted suspension of the phasedown in rice straw burning, the two documents in large measure played the tune that plaintiffs wanted to hear, even if they did not sound the climax plaintiffs were hoping for.[11]

## DISPOSITION

The judgment is affirmed.

Morrison, J., and Robie, J., concurred.

---

[11] Plaintiffs also disagree with the trial court's reasoning leading to the conclusion that the obligation imposed by subdivision (n) to prepare a 2001 progress report diminished the need for relief with respect to the 1999 report at issue here. Since, as we have stated, in mandamus cases an appellate court reviews the trial court's action de novo, we need not address these challenges.